UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAT J. SUDLER,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )        No. 4:06-CV-75 (CEJ)
                                  )
MICHAEL J. ASTRUE[1],             )
Commissioner of Social            )
Security,                         )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I. Procedural History

On October 29, 2003, plaintiff Pat J. Sudler filed an
application for a period of disability and disability insurance
benefits under Title II of the Social Security Act, 42 U.S.C.
§§ 401 et seq., §§ 1381 et seq.  (Tr. 86-88).  Plaintiff alleged
disability resulting from shoulder and arm problems, pain in her
knees and legs, depression, and difficulty with breathing.  (Tr.
139).  Plaintiff alleged that her disabling condition began on June
25, 1996. (Tr. 86).  Plaintiff was insured for disability insurance
benefits through December 31, 2003.  (Tr. 71).

---

[1]Michael J. Astrue became the Commissioner of Social
Security on January 20, 2007.  Pursuant to Rule 25(d)(1) of the
Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for Commissioner Jo Anne B. Barnhart as
Defendant in this suit.  No further action need be taken to
continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff's applications were initially denied by defendant. (Tr. 65-69). Plaintiff requested a hearing, which was held before an Administrative Law Judge (ALJ) on August 15, 2005. (Tr. 21). Plaintiff was present and was represented by counsel at the hearing. (Tr. 21). Plaintiff testified in response to questions posed by her attorney and the ALJ. (Tr. 21-40). On September 21, 2005, the ALJ found that plaintiff was not disabled and denied her claims for benefits. (Tr. 20). Plaintiff requested review of the ALJ's decision by the Appeals Council. (Tr. 7-8). On December 9, 2005, the Appeals Council denied plaintiff's request for review. (Tr. 3-5). Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. <u>Evidence Before the ALJ</u>

At the August 15, 2005, hearing, plaintiff was fifty-six years old; she was 5'7" tall and weighed 190 pounds. (Tr. 25). Plaintiff testified that she had completed the ninth grade, and had received no formal education after that. (Tr. 26). Plaintiff was unmarried, she had no children, and she lived alone. (Tr. 26).

Plaintiff testified that she began working at the Ford assembly plant in 1988. (Tr. 30) She was an assembly line worker, and her job involved using hand tools, climbing, crawling and lifting. (Tr. 27). In her Disability Report, plaintiff wrote that her work required constant standing, walking, bending and reaching. (Tr. 133). The heaviest weight she was required to lift was twenty pounds. (Tr. 123). Plaintiff testified that she last worked for

Ford in 1998, and that she thereafter began receiving disability benefits from Ford in the company. (Tr. 27-29). Plaintiff testified that Ford placed her on disability because of Tourette's Syndrome.[2] (Tr. 28).

When asked about her most severe limitation, plaintiff indicated that she had difficulty breathing. (Tr. 31). Plaintiff testified that she smoked two packs of cigarettes per day. (Tr. 31). She stated that she was unable to walk from one end of a store to the other without experiencing shortness of breath. (Tr. 33). At the time of the hearing, plaintiff was using an Albuterol inhaler four times a day. Plaintiff stated that dust made her breathing more difficult. (Tr. 34-35). Plaintiff also testified that she suffers from arthritis in her shoulders and knees. (Tr. 32-33, 35). The arthritis causes her pain when she walks even short distances. (Tr. 35). Plaintiff also testified that she had surgery performed on her elbow and wrist due to carpal tunnel syndrome.[3]

Plaintiff is capable of driving, doing laundry, washing the dishes, and taking out the trash. (Tr. 38, 102). However, when she stands too long performing those activities, the lower part of

_____

[2]Tourette's Syndrome is a tic disorder which may cause obsessive-compulsive behavior or attention deficit disorder. See PDR Med. Dict. 1769 (2d ed. 2000). Plaintiff is not alleging in her application for disability benefits that she is disabled due to Tourette's Syndrome. Indeed, there is no other mention or diagnosis of Tourette's Syndrome throughout the entire record.

[3]Carpal Tunnel Syndrome refers to nerve entrapment which causes pain and sensory loss in the hands and wrists. See PDR Med. Dict. 1749 (2d ed. 2000).

her back hurts and she needs to sit for awhile. (Tr. 103).
Plaintiff once had someone help her with the housecleaning, but no
longer did at the time of the hearing. She testified that it took
her two hours to clean one room. Plaintiff was able to perform
basic errands such as making a trip to the bank, post office, or
grocery store. (Tr. 38, 102). However, when carrying grocery bags
a mere twenty-five feet, she feels fatigued and suffers shortness
of breath. (Tr. 31-32). In her Disability Report, plaintiff
stated that she was unable to vacuum or sweep, but at the hearing
she testified that she vacuums her house to eliminate dust. (Tr.
35, 102). Plaintiff also stated in her report that she is no
longer capable of doing home repairs, car maintenance, or lawn
work. (Tr. 102). She reported that she had no difficulty getting
out of her home. (Tr. 105).

Plaintiff's average day involved watching television and
taking care of her two pet cats. (Tr. 104). She also enjoyed
doing word puzzles. (Tr. 104). Much of her day is spent at a bar.
(Tr. 104). Plaintiff once drank twelve to fourteen beers a day.
(Tr. 36). By the time of the hearing, plaintiff had reduced her
consumption to six or seven beers two times a week. (Tr. 36).
Plaintiff had no difficulties watching television shows or movies.
(Tr. 104). However, plaintiff claimed that her legs "get nervous"
if she sits for too long at one time. (Tr. 104). She also
reported difficulty getting off the couch after sitting for any
prolonged period of time. (Tr. 104).

### III. <u>Medical Records</u>

-4-

From late 1991 through 1992, plaintiff saw Edward Stein, D.P.M., on several occasions for treatment of plantar lesions[4] on her feet. (Tr. 235-238). On August 10, 1992, plaintiff requested surgery to correct her multiple foot deformities. (Tr. 235). Surgery was performed on September 17, 1992. (Tr. 216-217). During a post-operative checkup on September 21, 1992, Dr. Stein found no signs of complications. (Tr. 235). Plaintiff was "doing well" on September 30, 1992, and "doing very well" on October 14, 1992. (Tr. 234). On October 28, 1992, plaintiff stated that she experienced discomfort in her feet and could not bend her left hallux.[5] (Tr. 234). Nevertheless, Dr. Stein noted that plaintiff was "doing well" with no signs of complications. (Tr. 234). Dr. Stein felt that plaintiff might benefit from surgery on her toenails as well. (Tr. 234). This operation was performed on November 20, 1992. (Tr. 202-210). After the surgery, plaintiff was "doing well". (Tr. 233). Plaintiff was taking Amoxicillin[6]. (Tr. 232).

Plaintiff reported pain in her feet on December 16, 1992. (Tr. 232). Dr. Stein felt that recovery would simply take additional time and felt that plaintiff was "making excellent progress". (Tr.

[4]Plantar lesions are wounds or areas of damaged tissue on the sole of the foot. See PDR Med. Dict. 987, 1392 (2d ed. 2000).

[5]The left hallux is the left large toe. See PDR Med. Dict. 784 (2d ed. 2000).

[6]Amoxicillin is a penicillin based antibiotic which is used to treat bacterial infections. See MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a685001.html (Feb. 26, 2007).

232).  Plaintiff reported less pain on January 6, 1993, but was still experiencing discomfort.  (Tr. 232).  Dr. Stein noted that plaintiff's bone was not healing as quickly as it should, and placed plaintiff on hydrotherapy[7] treatment.  (Tr. 232). Plaintiff's condition was improving on January 20, 1993, but she was still unable to stand for long periods of time. (Tr. 231).  On January 27, 1993, Dr. Stein noted that plaintiff was "relatively in good position".  (Tr. 231).  When plaintiff returned to visit Dr. Stein on February 3, 1993, plaintiff indicated that she was still experiencing pain and discomfort in her left foot.  (Tr. 231).  Dr. Stein recommended that plaintiff postpone her return to work until her foot could more fully heal.  (Tr. 231).  On February 17, 1992, Dr. Stein found that good bone bridging was taking place.  (Tr. 229).

Plaintiff saw Dr. Stein again on March 3, 1993.  (Tr. 229). She had injured her left foot while shoveling snow.  (Tr. 229). Plaintiff told Dr. Stein that her left foot was still causing her pain.  (Tr. 229).  Plaintiff presented to Dr. Stein on March 17, 1993, and stated that she felt a "great deal better".  (Tr. 229). Plaintiff resumed working at Ford shortly thereafter.  (Tr. 229). She presented to Dr. Stein on March 24, 1993, complaining that her feet bothered her while she was working.  (Tr. 229).  She felt she would be unable to continue work for awhile because of the pain in

---

[7]Hydrotherapy refers to the therapeutic use of water for either its pressure effect or as a means of applying physical energy to the tissues.  See PDR Med. Dict. 843 (2d ed. 2000).

her foot.  (Tr. 228).  The medical records do not reflect any further treatment by Dr. Stein regarding plaintiff's feet.

On April 11, 1996, plaintiff had an x-ray taken after she complained of numbness in her fourth and fifth metacarpals[8] and fingers.  (Tr. 220).  Results showed a normal right elbow and only minimal degenerative changes about the distal interphalangeal joints[9].  (Tr. 220).

Plaintiff presented to S. Vic Glogovac, M.D., on May 28, 1996, complaining of difficulty using her right hand.  (Tr. 197).  Dr. Glogovac suspected that plaintiff had carpal tunnel syndrome and cubital tunnel syndrome[10], along with Guyon's canal syndrome[11].  (Tr. 196).  On June 25, 1996, Dr. Glogovac performed an operation which verified his suspicions.  (Tr. 200).  Dr. Glogovac performed a decompression, carpal tunnel, cubital tunnel, and Guyon's canal release procedure.  (Tr. 200).

Plaintiff continued seeing Dr. Glogovac through October 11, 1996.  (Tr. 190-197).  Unfortunately, as the ALJ noted, the majority of Dr. Glogovac's treatment notes are illegible.  Dr. Glogovac's notes on September 13, 1996, indicate that plaintiff had

---

[8]The metacarpals are the five long bones which form the skeleton of the palm.  See PDR Med. Dict. 224 (2d ed. 2000).

[9]The interphalangeal joints are hinge joints in the fingers. See PDR Med. Dict. 944 (2d ed. 2000).

[10]Cubital Tunnel Syndrome refers to a group of symptoms that develop from the compression of the ulnar nerve at the elbow. See PDR Med. Dict. 1751 (2d ed. 2000).

[11]Guyon's Canal Syndrome refers to the entrapment of the ulnar nerve as it passes into the wrist.  See PDR Med. Dict. 1755 (2d ed. 2000).

pain over her right elbow. (Tr. 192). On October 11, 1996, in his final treatment note, Dr. Glogovac cleared plaintiff for work, but restricted her to light work that required no fine motor movement of her upper extremities for a period of one month. (Tr. 190).

On January 21, 1997, plaintiff was seen in a consultative examination by Donald O. Burst, M.D. (Tr. 184-188). Plaintiff reported that she had numbness and a tingling sensation in her fourth and fifth fingers on her right hand. (Tr. 184). Plaintiff acknowledged that she is left handed. (Tr. 184). She also complained of pain on the inner half of her right forearm and tenderness on her right elbow. (Tr. 184). Plaintiff told Dr. Burst that she wanted to return to work, but that her employer told her that it had no available positions that would accommodate her limitations. (Tr. 184). Plaintiff indicated that she has difficulty lifting heavy objects with her right hand. (Tr. 185). Dr. Burst described plaintiff as pleasant and cooperative. (Tr. 185). Plaintiff had no difficulty moving around the examination room and table. (Tr. 185). She had a normal gait. (Tr. 185). She did not use any external aid in walking. (Tr. 185). Plaintiff admitted to Dr. Burst that she smoked two packages of cigarettes each day. (Tr. 185). She also stated that she has been drinking beer for the past thirty-five years, but denied alcoholism. (Tr. 185).

Dr. Burst's exam found no irregularities in plaintiff's shoulders other than some tenderness over the shoulder joints. (Tr. 185). Plaintiff's scars on her right arm were also tender to

touch.  (Tr. 185).  Dr. Burst noted that Tinel's sign[12] was present throughout her right arm.  (Tr. 185).  However, Dr. Burst found that plaintiff had no restrictions of motion.  (Tr. 185, 187-188).  Dr. Burst noted that plaintiff had a strong grip and full finger motion.  (Tr. 185, 187).

 Plaintiff saw Benjamin Goldstein, M.D., on November 28, 1999, complaining of a cough.  (Tr. 182).  Dr. Goldstein found that plaintiff suffered from dyspnea on exertion[13], chronic obstructive pulmonary disease[14], and peripheral vascular disease[15].  (Tr. 182-183).  Plaintiff was given an inhaler to treat her cough.  (Tr. 183). Plaintiff also complained of pain in her right knee and shoulder.  (Tr. 182-183).  No medication was given for this pain.  (Tr. 182-183).

The medical records reflect that plaintiff did not see Dr. Goldstein again until June 27, 2002, more than two and one-half years after her first visit.  During the second visit, plaintiff complained of a kidney stone.  (Tr. 180).  Dr. Goldstein noted that

---

[12]Tinel's sign refers to the sensation of tingling on percussion.  See PDR Med. Dict. 1640 (2d ed. 2000).

[13]Dyspnea on exertion refers to shortness of breath after exercise.  See PDR Med. Dict. 556 (2d ed. 2000).

[14]Chronic Obstructive Pulmonary Disease, or COPD, is a general term for diseases with permanent or temporary narrowing of the small bronchi.  See PDR Med. Dict. 512 (2d ed. 2000).

[15]Peripheral Vascular Disease, or Arteriosclerosis of the extremities, refers to hardening of the arteries that supply the legs and feet, which causes a decrease in blood flow that can injure nerves and tissues.  See MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000170.htm (Feb. 26, 2007).

plaintiff still suffered from chronic obstructive pulmonary disease and peripheral vascular disease and that she was still smoking two packs of cigarettes per day. (Tr. 178, 180).

Plaintiff saw Dr. Goldstein again on September 4, 2002. (Tr. 175). Dr. Goldstein diagnosed plaintiff as having a nicotine addiction. (Tr. 175). Treatment notes also reflect a diagnosis of hypercholesterolemia[16]. (Tr. 175). Plaintiff continued to have chronic pulmonary disease and peripheral vascular disease. (Tr. 175). However, plaintiff indicated that she felt well. (Tr. 175).

Plaintiff did not again seek treatment again until one year later, on October 28, 2003.[17] (Tr. 174). At that time, plaintiff complained that her legs felt weak and that she had difficulty standing. (Tr. 174). Plaintiff also claimed that her knees hurt and that she was unable to walk down a flight of stairs. (Tr. 174). Plaintiff also indicated that she felt depressed. (Tr. 174). Dr. Goldstein prescribed Lexapro[18]. He felt that, in addition to depression, plaintiff continued to have a nicotine addiction, chronic obstructive pulmonary disease, peripheral vascular disease, and hypercholesterolemia. (Tr. 174). Dr.

_____

[16]Hypercholesterolemia refers to a high amount of cholesterol in the blood. See PDR Med. Dict. 848 (2d ed. 2000).

[17]As noted by the ALJ, plaintiff protectively filed her application for disability benefits on October 21, 2003, just several days before this visit with Dr. Goldstein.

[18]Lexapro, or Escitalopram, is used to treat depression. See MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html (Feb. 26, 2007).

Goldstein encouraged plaintiff to stop smoking and drinking alcohol. (Tr. 171).

On December 19, 2003, Dr. Goldstein noted that plaintiff still had chronic obstructive pulmonary disease, peripheral vascular disease, hypercholesterolemia, and a nicotine addiction. (Tr. 145-146). Depression is no longer mentioned. (Tr. 145). Plaintiff had no complaints. (Tr. 145-146). Plaintiff was still smoking two packs of cigarettes a day. (Tr. 145). Dr. Goldstein prescribed Zocor[19] and Zetia[20]. (Tr. 145).

On December 23, 2003, plaintiff was seen in a consultative examination by Dr. Raymond Leung. (Tr. 160-165). Plaintiff complained only of right knee pain and shortness of breath. (Tr. 160). Plaintiff told Dr. Leung that she wore out her knee out while working. (Tr. 160). She stated that the pain was medium in intensity, and was not constant. (Tr. 160). Plaintiff claimed that the pain intensifies when she bends, and that she cannot easily squat or stand for a prolonged period of time. (Tr. 161). Tylenol helps control the pain. (Tr. 160). Plaintiff had no difficulty sitting for prolonged periods of time. (Tr. 161). Plaintiff told Dr. Leung that she didn't know if there were any

---

[19]Zocor is a brand name for the drug Simvastatin, which is used to reduce the amount of cholesterol in the blood. See MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a692030.html (Feb. 26, 2007).

[20]Zetia is a brand name for the drug Ezetimibe, which is used to lower cholesterol in the blood. See MedlinePlus, http:// www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603015.html (Feb. 26, 2007).

problems with her shoulder and arm because she had stopped working. (Tr. 160).

Plaintiff informed Dr. Leung that she smoked two packs of cigarettes per day, and had been smoking for forty years. (Tr. 160). Dr. Leung noted occasional coughing and wheezing. (Tr. 160). Plaintiff stated that she used her inhaler once every two months on average. (Tr. 161). Plaintiff also stated that she drank more that twelve beers five to six days a week. (Tr. 161).

Dr. Leung found plaintiff's gait to be within normal limits. (Tr. 162). Plaintiff had no difficulty getting onto or off of the examination table. (Tr. 162). Dr. Leung noted decreased breath sounds bilaterally. (Tr. 162). Dr. Leung found no other irregularities. (Tr. 160-163). He concluded that plaintiff had chronic obstructive pulmonary disease and right shoulder pain. (Tr. 163). Dr. Leung did not have a diagnosis for right knee pain, noting that plaintiff had a full range of motion for her right knee and that it was stable. (Tr. 163). He noted that, because of her claim of knee pain and her history of carpal tunnel syndrome, plaintiff might have difficulty with prolonged walking, bending, standing, or lifting. (Tr. 163).

On December 24, 2003, plaintiff visited or called Dr. Goldstein complaining of a runny nose and difficulty breathing. (Tr. 145). Plaintiff was prescribed Albuterol[21]. (Tr. 145).

---

[21]Albuterol is used to treat breathing problems such as wheezing, asthma, and shortness of breath. See MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682145.html (Feb 26, 2007).

Plaintiff did not return to see Dr. Goldstein until June 6, 2005, after her initial hearing date.[22]  (Tr. 144-145).

During her June 6, 2005 visit with Dr. Goldstein, plaintiff stated that she had been placed on disability retirement from Ford. (Tr. 144-145).  She claimed that she was unable to work because of pain in her right shoulder.  (Tr. 145).  Dr. Goldstein noted that plaintiff had a chronic cough.  (Tr. 144-145).  Plaintiff admitted that she was still smoking two packs of cigarettes each day.  (Tr. 145).  Dr. Goldstein found for the first time that plaintiff suffered from osteoarthritis[23].  (Tr. 144).  In addition, plaintiff was still diagnosed with having chronic obstructive pulmonary disease, hypercholesterolemia, nicotine addiction, and peripheral vascular disease.  (Tr. 144).

Dr. Goldstein also completed a Residual Functional Capacity assessment form on June 6, 2005.  (Tr. 154-159).  Dr. Goldstein found that plaintiff could sit for two hours per eight hour workday.  (Tr. 154).  Dr. Goldstein indicated that plaintiff was capable of standing for only one hour, and could walk for even less than one hour per work day.  (Tr. 154).  These findings were based on plaintiff's arthritis, which caused pain in plaintiff's knees and back, and the peripheral vascular disease, which limits her

[22]Plaintiff's hearing began on June 1, 2005.  At the time, there had been no additional treatment notes since the December 2003 office visit.  Plaintiff's attorney successfully requested postponing the hearing so that updated medical evidence could be presented. (Tr. 16).

[23]Osteoarthritis is characterized by erosion of cartilage causing pain and loss of function.  See PDR Med. Dict. 1282 (2d ed. 2000).

ability to walk. (Tr. 154). Dr. Goldstein noted that plaintiff could lift and carry up to ten pounds frequently and up to twenty pounds occasionally. (Tr. 154). He explained that plaintiff's chronic obstructive pulmonary disease limited her ability to exert herself. (Tr. 154).

Dr. Goldstein found that plaintiff was generally capable of using her hands for repetitive actions such as simple grasping, pushing and pulling, and fine manipulation. (Tr. 155). However, plaintiff could not use her left hand for fine manipulation. (Tr. 155). Dr. Goldstein indicated that plaintiff was unable to squat, crawl, climb, stoop, crouch, or kneel. (Tr. 155). Plaintiff could only occasionally bend and reach, due to her arthritis. (Tr. 155-156). Dr. Goldstein found that, because of her chronic obstructive pulmonary disease, plaintiff could not tolerate exposure to unprotected heights, marked temperature changes, noise, or dust and fumes. (Tr. 156). Dr. Goldstein described plaintiff's right shoulder pain as "moderate", indicating that it can be tolerated but that it would cause a marked handicap in performance of the activity which causes the pain. (Tr. 157). Dr. Goldstein also indicated that plaintiff suffered from depression, causing difficulty in concentration and remembering things. (Tr. 157-158).

On June 23, 2005, Dr. Goldstein prescribed Vytorin[24] for plaintiff. Plaintiff stopped taking the Vytorin on July 25, 2005,

---

[24]Vytorin is used to lower cholesterol. See MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/500567.html (Feb. 26, 2007).

after experiencing an itching side effect. (Tr. 141). Plaintiff's final visit with Dr. Goldstein came on August 8, 2005. (Tr. 141). Plaintiff was still smoking two packs of cigarettes per day and drinking six to seven beers twice a week. (Tr. 141). Plaintiff did not have any pain or complaints. (Tr. 141).

## IV.  **The ALJ's Decision**

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on June 25, 1996, the date the claimant stated she became unable to work, and continued to meet them through December 31, 2003.

2.    The claimant has engaged in substantial gainful activity since her alleged onset date of June 25, 1996. However, she has not engaged in substantial gainful activity since 1998.

3.    The medical evidence establishes that the claimant has moderate chronic obstructive pulmonary disease and a remote history of surgery to her non-dominant right upper extremity, but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's allegations of symptoms precluding all of her past relevant work are not consistent with the evidence as a whole and are not persuasive.

5.    The claimant has the residual functional capacity to perform the physical exertion requirements of work except for lifting more than twenty pounds occasionally. She should avoid exposure of excessive amounts of airborne particulate such as smoke, fumes, dust that is also in excess of what she inhales on a daily basis when smoking cigarettes. The need to avoid exposure to excessive amount of airborne particulate does not significantly impact the range of light work that she can perform, SSR 85-15. The claimant does not have a medically determined mental impairment.

6.    The claimant's past relevant work, as an automotive assembler did not require the performance of work-

-15-

related activities precluded by the above limitation(s) (20 CFR 404.1565).

7.   The claimant's impairments do not prevent her from performing her past relevant work.

8.   The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

9.   The claimant did not sustain her burden of proving that she cannot perform her past relevant work.

## V.   Discussion

To be eligible for disability insurance benefits, a plaintiff must prove that she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  <u>Nimick v. Secretary of Health and Human Serv.</u>, 887 F.2d 864 (8th Cir. 1989).  The ALJ first determines

whether the claimant is engaged in substantial gainful activity.
If the claimant is so engaged, she is not disabled.  Second, the
ALJ determines whether the claimant has a "severe impairment,"
meaning one which significantly limits her ability to do basic work
activities.  If the claimant's impairment is not severe, she is not
disabled.   Third, the ALJ determines whether the claimant's
impairment meets or is equal to one of the impairments listed in 20
C.F.R. Part 404, Subpart P, Appendix 1.   If the claimant's
impairment is, or equals, one of the listed impairments, she is
disabled under the Act.   Fourth, the ALJ determines whether the
claimant can perform her past relevant work.  If the claimant can,
she is not disabled.  Fifth, if the claimant cannot perform her
past relevant work, the ALJ determines whether she is capable of
performing any other work in the national economy.  If the claimant
is not, she is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920
(2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

**A.    <u>Standard of Review</u>**

The Court must affirm the Commissioner's decision, "if the
decision is not based on legal error and if there is substantial
evidence in the record as a whole to support the conclusion that
the claimant was not disabled." <u>Long v. Chater</u>, 108 F.3d 185, 187
(8th Cir. 1997).   "Substantial evidence is less than a
preponderance, but enough so that a reasonable mind might find it
adequate to support the conclusion." <u>Estes v. Barnhart</u>, 275 F.3d
722, 724 (8th Cir. 2002) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145,
1147 (8th Cir. 2001)).  The Court may not reverse merely because

the evidence could support a contrary outcome. <u>Estes</u>, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.  the ALJ's credibility findings;

2.  the plaintiff's vocational factors;

3.  the medical evidence;

4.  the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.  third-party corroboration of the plaintiff's impairments; and

6.  when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992).

"In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000). In these instances, the Court must "decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." <u>Id.</u>

The Court must consider any evidence that detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial

evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## B. <u>Plaintiff's Allegations of Error</u>

Plaintiff asserts that the ALJ's findings of residual functional capacity are not supported by substantial evidence. Specifically, plaintiff contends that the ALJ inappropriately discounted the medical opinions of plaintiff's treating physician, Dr. Goldstein. Plaintiff also argues that the ALJ failed to fully and fairly develop the record by discounting Dr. Goldstein's opinion without requesting additional information .

Plaintiff also argues that the ALJ failed to properly consider plaintiff's subjective complaints. Plaintiff asserts that the ALJ's conclusions regarding her lack of credibility and financial motivation are erroneous. Finally, plaintiff contends that the ALJ failed to properly analyze the demands of plaintiff's past relevant work prior to reaching the conclusion that her impairments did not preclude such work.

### 1. Credibility Determination

The Court will first turn to plaintiff's assertion that the ALJ failed to properly consider plaintiff's subjective complaints. The ALJ found that plaintiff was not fully credible and cited the familiar <u>Polaski</u> factors. <u>See Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Under <u>Polaski</u>, when assessing whether a claimant's subjective complaints are credible, the ALJ must consider all of the evidence, including claimant's work history and observations regarding: (1) claimant's daily activities; (2) the

duration, frequency and intensity of the pain; (3) the dosage, effectiveness and side effects of medication; (4) any precipitating and aggravating factors; and (5) claimant's functional restrictions." Polaski, 739 F.2d at 1321. However, the ALJ is not required to discuss each Polaski consideration, so long as its considerations were acknowledged and examined prior to discounting the claimant's subjective complaints. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

The Court finds that, in his assessment of plaintiff's credibility and alleged disability, the ALJ considered the correct factors as set forth in Polaski. First, the ALJ properly found that plaintiff's lack of ongoing and consistent treatment undermined her credibility. Plaintiff is alleging disability since June 25, 1996. On that date, plaintiff was diagnosed by Dr. Glogovac with carpal tunnel syndrome. However, on October 11, 1996, plaintiff returned to light work activities and did not seek treatment from Dr. Glogovac again. Her next appointment was for a consultation with Dr. Burst on January 21, 1997, at a time when plaintiff was seeking disability benefits in an earlier application.[25] The medical records do not reflect additional

---

[25]This is plaintiff's third application for benefits. Her first was filed on February 17, 1993 alleging disability as she recovered from foot surgery. This application was denied and not further pursued. The second was filed on December 16, 1996 alleging disability due to shoulder, hand and elbow pain. Her consultative exam with Dr. Burst was for the purposes of supplying additional medical records for this second application. This application was denied on January 30, 1997. In 1998, plaintiff returned to her past work as an assembler at the substantial gainful activity level. (Tr. 15).

treatment until March 5, 1998, when plaintiff first visited Dr. Goldstein. (Tr. 182). Her appointments with Dr. Goldstein are particularly sporadic. After her initial appointment in March 1998, she did not return until November 1999. (Tr. 182-183). Medical records do not reflect any subsequent visits with Dr. Goldstein, or any doctor, until June 2002, when plaintiff complained of a kidney stone. (Tr. 179-180). From June 2002 through September 2002, treatment notes indicate only that plaintiff had high cholesterol, a cough, nicotine addiction, and chronic obstructive pulmonary disease. (Tr. 175-179). Plaintiff stated that she felt fine. (Tr. 175). Plaintiff did not return again until October 28, 2003, just several days after she protectively filed this application. This visit represents plaintiff's first major allegations of leg and knee pain. (Tr. 174). Further, plaintiff did not visit Dr. Goldstein at any time between December 2003 and June 2005. The timing of these allegations, together with a history of very sporadic treatment, cast doubt on plaintiff's claims of any continuing disabling condition.

Second, it was proper for the ALJ to take into consideration that plaintiff smokes two packs of cigarettes per day, and has been doing so for forty years. See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). Plaintiff claims to suffer from difficulty in breathing. Indeed, medical records support a diagnosis of chronic obstructive pulmonary disease. Plaintiff was advised to quit smoking by Dr. Goldstein. (Tr. 173-174). Despite her condition

and her doctor's recommendation, plaintiff continued smoking two packs per day. It is not erroneous to conclude that plaintiff's refusal to quit smoking indicates that she subjectively felt that her chronic obstructive pulmonary disease was not serious enough to warrant her to do so. Further, a refusal to follow a prescribed course of treatment, including cessation of smoking, without good cause is grounds for denying an application for benefits. See Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

In addition, the lack of any prescribed pain medication detracts from plaintiff's subjective allegations of pain. Plaintiff's disability report lists no medications. (Tr. 125). Further, neither Dr. Goldstein nor plaintiff's consultative doctors found any objective indicators of pain. For these reasons, it was not erroneous for the ALJ to discount plaintiff's subjective complaints of pain.

### 2. Residual Functional Capacity

The Court will next examine plaintiff's argument that the ALJ's residual functional capacity assessment, finding that plaintiff could perform light work activity, is not supported by substantial evidence. It is the duty of the ALJ to determine plaintiff's residual functional capacity, after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001). However, "[a] claimant's residual functional capacity is a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Thus, while the ALJ must consider all relevant evidence, at least "some medical evidence" must support the

residual capacity conclusions of the ALJ.  See Lauer, 245 F.3d at
704.

Plaintiff believes that the ALJ's assessment of residual
functional capacity is erroneous due to the ALJ's decision to give
little or no weight to the medical opinion of plaintiff's treating
physician, Dr. Goldstein.  "It is the ALJ's function to resolve
conflicts among the various treating and examining physicians."
Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995).  "A treating
physician's opinion does not automatically control, since the
record must be evaluated as a whole."  Reed v. Barnhart, 399 F.3d
917, 920 (8th Cir. 2005).  However, the "treating physician's
opinion is given controlling weight if it is well-supported by
medically acceptable clinical and laboratory diagnostic techniques
and is not inconsistent with the other substantial evidence."
Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002).

In the Court's view, the ALJ properly discounted the opinions
of plaintiff's treating physician, Dr. Goldstein.  Dr. Goldstein's
conclusions in his residual functional capacity assessment form
completed on June 6, 2005 are largely inconsistent with his own
treatment notes and the record as a whole.  In the assessment form,
Dr. Goldstein indicated that plaintiff suffered from arthritis
causing her pain in the knees, back, and right shoulder.  (Tr.
156).  Several of Dr. Goldstein's conclusions in the residual
functional capacity assessment form are based on plaintiff's
allegations of arthritis.  For instance, Dr. Goldstein's finds that
plaintiff cannot stand for over one hour per work day or sit for

-23-

long periods of time due to her arthritis. Plaintiff's alleged limitations on her inability to bend, reach, squat, crawl, climb, stoop, crouch and kneel were all based on her arthritis. (Tr. 155-156).

However, plaintiff had never been diagnosed with arthritis before that date. Indeed, there is no mention or even allegation of arthritis in any of plaintiff's treatment notes prior to the June 6, 2005 meeting with Dr. Goldstein. It is noted that plaintiff was last insured for Title II benefits on December 31, 2003, a date well before any discussion of arthritis. Dr. Goldstein's examinations of plaintiff in December 2003 yielded no finding of arthritis. (Tr. 145-146). Further, throughout his treatment of plaintiff, Dr. Goldstein did not prescribe any pain medication which would indicate that plaintiff was suffering from arthritis pain. The treatment notes also fail to show any continuing complaints of leg pain or hip pain. Further, in the examinations conducted by plaintiff's other physicians, not one indicated the existence of arthritis. Indeed, when plaintiff was examined by Dr. Leung on December 23, 2003, she reported that she was unsure if she still had any problems with her shoulders or arms. (Tr. 160). Further, Dr. Goldstein notes that there were not any objective indicators of pain. (Tr. 158). Instead, each of Dr. Goldstein's conclusions, including his finding that plaintiff suffers from arthritis, was apparently reached solely on the basis of plaintiff's subjective complaints, which, as noted above, are not fully credible. Dr. Goldstein's conclusions regarding

plaintiff's alleged arthritis are simply inconsistent with his treatment notes and the record as a whole.

Dr. Goldstein's residual functional capacity assessment also found that plaintiff suffered from depression. (Tr. 157). Dr. Goldstein noted that this resulted in difficulty concentrating and remembering things. However, other than the October 26, 2003 office visit where plaintiff indicated that she wanted disability benefits, there is no indication of depression throughout the medical record. Indeed, during plaintiff's visits with Dr. Goldstein between October 26, 2003 and June 6, 2005, the date Dr. Goldstein completed the residual functional capacity analysis, there is no mention or diagnosis of depression in the treatment notes.

Dr. Goldstein also noted that plaintiff was unable to perform fine manipulation with her left hand. (Tr. 155). However, the treatment notes do not show any complaints by plaintiff regarding pain or limitations of her left hand. Further, Dr. Goldstein states in a conclusory fashion that plaintiff cannot tolerate any exposure to noise. There is no diagnosis or indication throughout the treatment notes that plaintiff has such an intolerance to noise. These inconsistencies detract from the credibility of Dr. Goldstein's residual functional capacity assessment.

Plaintiff believes that the opinions of her consultative physicians, Dr. Leung and Dr. Burst, lend credence to Dr. Goldstein's opinion. The Court does not agree. When Dr. Burst saw plaintiff on January 21, 1997, he found that she had full range of

motion. (Tr. 187). Dr. Burst found no irregularities in the shoulders, other than some subjective tenderness over the acromioclavicular joints. (Tr. 185). Examination of plaintiff's right arm revealed only subjective tenderness. (Tr. 185). Dr. Burst believed plaintiff had a satisfactory prognosis. (Tr. 185). Plaintiff did not offer any complaints regarding chest pain, back pain, or leg pain. (Tr. 185).

Dr. Leung's examination on December 23, 2003, revealed that plaintiff again had full range of motion. (Tr. 160-165). Dr. Leung found no diagnosis for plaintiff's subjective claims of knee pain. (Tr. 163). Plaintiff's gait was within normal limits. (Tr. 162). Plaintiff had no difficulty moving around the examination room and table, and was able to walk unassisted and to squat during the exam. (Tr. 162). Dr. Leung noted no muscle atrophy. (Tr. 162). While Dr. Leung does note that plaintiff may have difficulty with prolonged walking, bending, standing, or lifting, his conclusion was based on plaintiff's subjective complaints of knee pain and not on any diagnosis or irregularity that he found. Neither Dr. Burst's nor Dr. Leung's treatment notes support the conclusions formed in Dr. Goldstein's residual functional capacity assessment form.

Plaintiff also argues that the ALJ failed to fully develop the record by discounting Dr. Goldstein's opinion without first re-contacting him for further information. An ALJ is "not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d

785, 791 (8th Cir. 2005). The ALJ does not indicate that any issue was left untouched by Dr. Goldstein's notes. Instead, the ALJ found that Dr. Goldstein's conclusion and residual functional capacity assessment were not supported by substantial evidence. The ALJ was not required to re-contact plaintiff's treating physician.

The Court finds that the ALJ properly assessed plaintiff's residual functional capacity. In making that assessment, there was no error in discounting Dr. Goldstein's opinion or failing to re-contact Dr. Goldstein for more information. The ALJ's conclusion that plaintiff can return to light work is supported by substantial evidence, including "some medical evidence". See Lauer, 245 F.3d at 704. Dr. Glogovac permitted plaintiff to return to light work in October 2006, with no fine motor movement of the upper extremities for a period of only one month. (Tr. 190). An x-ray taken showed only minimal degenerative changes in plaintiff's shoulder and no problems with plaintiff's elbow. (Tr. 220). Treatment notes after that date consistently show that plaintiff has a full range of motion with no objective signs of pain. Plaintiff's subjective complaints of pain are inconsistent and, as shown above, not fully credible. The ALJ's residual functional capacity assessment, finding that plaintiff could perform light work, is supported by substantial evidence.

### 3. Past Relevant Work Analysis

Finally, plaintiff argues that the ALJ failed to make the required analysis under Pfitzner v. Apfel, 169 F.3d 566, 568 (8th

Cir. 1999), of plaintiff's past relevant work prior to determining that plaintiff was not precluded from it. In <u>Pfitzner</u>, the Court noted that the ALJ must specifically describe the plaintiff's residual functional capacity prior to determining on step four of the sequential analysis that plaintiff could return to her past relevant work. <u>Pfitzner</u>, 169 F.3d at 568. However, "[d]efining a claimant's residual functional capacity is not the only task required at step four." <u>Id.</u> at 569. "The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1239 (8th Cir. 1991).

In this matter, plaintiff claims that the ALJ merely cited to the Dictionary of Occupational titles to demonstrate the physical demands of plaintiff's past relevant work as an automotive assembler. Plaintiff argues that the ALJ failed to describe the mental demands of those jobs and determine how plaintiff's mental limitations affected his residual functional capacity. However, the Court is not convinced that the ALJ was required to do more. In <u>Pfitzner</u>, the Court found that the ALJ erred by neither making specific findings regarding the demands of the claimant's past work, nor referring to the Dictionary of Occupational Titles. <u>Pfitzner</u>, 169 F.3d at 569. It is not required that the ALJ do both.

Further, although plaintiff did complain of depression on one occasion, the evidence in the record fails to show that plaintiff has any medically determined mental impairment. Plaintiff did not

complain of depression on any later visit. Finally, the record lacks any evidence that any alleged mental impairment has interfered in any way with plaintiff's basic abilities to work. In Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999), the Eighth Circuit held that, where an ALJ finds that mental limitations do not significantly affect [the claimant's] ability to work, the ALJ is not required to make specific findings on step four regarding the mental demands of the past relevant work. Thus, under Rose, it was not necessary to discuss the mental demands of plaintiff's past relevant work.

The ALJ properly considered plaintiff's limitations in comparison with plaintiff's past relevant work as an automotive assembler. Substantial evidence supports the conclusion that plaintiff is not precluded from such work. Therefore, plaintiff is not disabled within the meaning of the Social Security Act and Regulations. See 20 CFR 404.1520(f) and 416.920(f).

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint and her brief in support of complaint is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 6th day of March, 2007.